Filed 11/15/21

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| THE INNS BY THE SEA,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>CALIFORNIA MUTUAL INSURANCE COMPANY,<br><br>    Defendant and Respondent. | D079036<br><br><br>(Super. Ct. No. 20CV001274) |

APPEAL from a judgment of the Superior Court of Monterey County, Lydia M. Villarreal, Judge. Affirmed.

Reiser Law, Michael J. Reiser, Matthew Reiser, Isabella Martinez; Hunton Andrews Kurth, Scott P. DeVries, Lorelie S. Masters, Rachel E. Hudgins; The Meade Firm, Tyler Meade, Samuel I. Ferguson and Seena Forouzan for Plaintiff and Appellant.

Covington & Burling, Jad H. Khazem, David B. Goodwin, Rani Gupta for Oakland Athletics Baseball Company, San Francisco Giants Baseball Club LLC, Los Angeles Dodgers LLC, Angels Baseball LP and Padres L.P. as Amici Curiae on behalf of Plaintiff and Appellant.

Reed Smith, David E. Weiss and T. Connor O'Carroll for United Policyholders as Amicus Curiae on behalf of Plaintiff and Appellant.

Hayes, Scott, Bonino, Ellingson, Guslani, Simonson & Clause, Mark G. Bonino, Stephen M. Hayes, Charles E. Tillage, and Ryan Z. Keller for Defendant and Respondent.

Crowell & Moring, Mark D. Plevin; Robinson & Cole and Wystan M. Ackerman for American Property Casualty Insurance Association and National Association of Mutual Insurance Companies as Amicus Curiae on behalf of Defendant and Respondent.

This appeal presents an issue of first impression for a California appellate court: does a commercial property insurance policy provide coverage for a business's lost income due to the COVID-19 pandemic?[1] As we

---

[1] Although no California appellate court has addressed the issue, numerous federal courts and courts in other states have done so. The relevant authorities are far too numerous to list here. The overwhelming majority of federal district court cases find no possibility of coverage under commercial property insurance policies for a business's pandemic-related loss of income (see, e.g., *Nguyen v. Travelers Casualty Ins. Co. of America* (W.D.Wash., May 28, 2021, No. 2:20-cv-00597-BJR) ___ F.Supp.3d ___ [2021 WL 2184878] (*Nguyen*) [describing the trend of holdings]), along with each federal appellate court to consider the issue (*Santo's Italian Cafe LLC v. Acuity Ins. Co.* (6th Cir. 2021) 15 F.4th 398 (*Santo's*); *Dakota Girls, LLC v. Philadelphia Indemnity Ins. Co.* (6th Cir., Nov. 5, 2021, No. 21-3245) ___ F.4th ___ [2021 WL 5144465]; *Oral Surgeons, P.C. v. Cincinnati Ins. Co.* (8th Cir. 2021) 2 F.4th 1141 (*Oral Surgeons*); *Gilreath Family & Cosmetic Dentistry, Inc. v. Cincinnati Ins. Co.* (11th Cir., Aug. 31, 2021, No. 21-11046) 2021 WL 3870697), including the Ninth Circuit applying California law (*Mudpie, Inc. v. Travelers Casualty Ins. Co. of America* (9th Cir. 2021) 15 F.4th 885). Some cases, however, do conclude to the contrary. (See, e.g., *Studio 417, Inc. v. Cincinnati Ins. Co.* (W.D.Mo. 2020) 478 F.Supp.3d 794; *In re Society Ins. Co. COVID-19 Business Interruption Protection Ins. Litigation*

will explain, under the specific insurance policy that California Mutual Insurance Company (California Mutual) issued to The Inns by the Sea (Inns) for its five lodging facilities, Inns cannot recover from California Mutual for its lost business income resulting from the COVID-19 pandemic. Further, Inns has not identified any manner in which it can amend its complaint to state a claim for coverage. Accordingly, we affirm the trial court's order sustaining California Mutual's demurrer without leave to amend.

## I.
## FACTUAL AND PROCEDURAL BACKGROUND

Inns operates four lodging facilities in Carmel-by-the-Sea, and one lodging facility in Half Moon Bay. On January 9, 2020, Inns renewed its commercial insurance policy with California Mutual (the Policy), which includes commercial property insurance covering each of Inns' five lodging facilities.

In March 2020, the COVID-19 pandemic resulted in government orders restricting the movement of citizens and the operation of businesses. On March 16 and 17, 2020, the counties of Monterey and San Mateo, where Inns' lodging facilities are located, issued orders for the express purpose of "ensur[ing] that the maximum number of people self-isolate in their places of residence to the maximum extent feasible, while enabling essential services to continue, to slow the spread of COVID-19 to the maximum extent possible"

_____

(N.D.Ill. 2021) 521 F.Supp.3d 729 (*Society Ins.*); *Derek Scott Williams PLLC v. Cincinnati Ins. Co.* (N.D.Ill. 2021) 522 F.Supp.3d 457; *Elegant Massage, LLC v. State Farm Mutual Automobile Ins. Co.* (E.D.Va. 2020) 506 F.Supp.3d 360.) A website administered by the University of Pennsylvania Law School titled "Covid Coverage Litigation Tracker" tracks rulings in insurance coverage litigation arising from the pandemic. (<https://cclt.law.upenn.edu/> [as of Nov. 15, 2021], archived at <https://perma.cc/U9Z3-L4LF>.) As reflected there, hundreds of merits-based rulings have been issued in both state and federal courts.

(the Orders).[2] Among other things, the Orders required citizens to shelter in place and prohibited travel unless essential. The Orders also required businesses (except those classified as "Essential Businesses") to cease all but minimum basic operations at any facilities located within the counties. The Monterey County order defined "Essential Businesses" to include "[h]otels, motels, bed and breakfast establishments, and other businesses that provide transient occupancy for visitors to the County, provided that such business[es] require their patrons to shelter in place as otherwise required by this Order." The San Mateo County order contained no such specification. Inns closed its lodging facilities in response to the Orders.

On March 24, 2020, Inns made a claim to California Mutual under its commercial property insurance coverage for the loss of business income caused by the pandemic. On the same day, California Mutual denied coverage, stating that "[l]oss of business due to reasons other than covered physical damage is beyond the scope of the insurance policy."

On April 20, 2020, Inns filed the instant lawsuit against California Mutual in Monterey County Superior Court. The complaint pled causes of action for (1) declaratory relief, (2) breach of contract, (3) breach of the

---

[2]    In support of its demurrer, California Mutual submitted an unopposed request that the trial court take judicial notice of the Orders. The trial court failed to rule on the request and did not indicate whether it considered the Orders in sustaining the demurrer. "[W]e as a reviewing court may take notice of matters properly subject to judicial notice, despite the failure of the trial court to do so." (*Chacon v. Litke* (2010) 181 Cal.App.4th 1234, 1251, fn. 10.) We hereby take judicial notice of the Orders pursuant to Evidence Code section 452, subdivision (c). (*Cruz v. County of Los Angeles* (1985) 173 Cal.App.3d 1131, 1134 [under Evid. Code, § 452, subd. (c), "judicial notice may be taken of '[o]fficial acts of the legislative, executive, and judicial departments of the United States and of any state in the United States,' [which] includes judicial notice of official acts of a county"].)

4

implied covenant of good faith and fair dealing, and (4) bad faith denial of insurance coverage, all of which were based on the allegation that the Policy provided coverage for Inns' loss of business income due to the pandemic.

As factual background, the complaint specifically alleged,

"19.   Emerging research on the virus and recent reports from the Center for Disease Control indicate that COVID-19 strains physically infect and can stay alive on surfaces for extended periods, a characteristic that renders property exposed to the contagion potentially unsafe and dangerous.

"20.   On March 17, 2020, the Inns were forced to cease operations based on orders from both the County of Monterey and the County of San Mateo ordering cessation of all non-essential travel and directing all businesses and governmental agencies to cease non-essential operations at physical locations.  These Closure Orders were issued in direct response to these dangerous physical conditions, and prohibit [Inns] from selling any rooms to the public, thereby forcing [Inns] to close the Inns and to lay off nearly all of its workers and triggering California Mutual's coverage responsibilities.

"21.   The Closure Orders were made in direct response to the continued and increasing presence of the coronavirus on [Inns'] property and/or around its premises."[3]

Attached to the complaint was the Policy issued to Inns by California Mutual.  The Policy provides commercial property insurance for "direct physical loss of or damage to Covered Property at the premises . . . caused by or resulting from any Covered Cause of Loss," with "Covered Property" generally encompassing Inns' buildings and business personal property, as

---

[3]    Similarly, the complaint alleged, "On March 17, 2020, as a direct and proximate result of the Closure Orders, [Inns] ceased operations at the Inns, as its rooms could no longer be rented to the public and the Inns could not be used for any purpose.  The occupancy rate at the Inns has dropped to zero. As a further direct and proximate result of the Closure Orders, [Inns] effectively furloughed all of its non-manager employees."

well as certain personal property of others, unless specifically limited. "Covered Causes of Loss" is defined to mean "Risks Of Direct Physical Loss," unless excluded or limited. To provide a simple example of this coverage, if a storm caused the roof to blow off one of Inns' properties, California Mutual would pay for the loss of the roof.[4]

As especially pertinent here, however, the commercial property insurance *also* provides "Business Income (and Extra Expense)" and "Civil Authority" coverage. The Business Income coverage states in relevant part: "We will pay for the actual loss of Business Income you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration'. The 'suspension' must be caused *by direct physical loss of or damage to property at [Inns'] premises* . . . . The loss or damage must be caused by or result from a Covered Cause of Loss." (Italics added.) The "Period of Restoration" is defined as "the period of time that: [¶] a. Begins: [¶] (1) 72 hours after the time of direct physical loss or damage for Business Income coverage; or [¶] (2) Immediately after the time of direct physical loss or damage for Extra Expense coverage; [¶] caused by or resulting from any Covered Cause of Loss at the described premises; and [¶] b. Ends on the earlier of: [¶] (1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar

---

[4]     To make the policy language more accessible, we use the simple example of a destructive windstorm. In so doing, however, we do not intend to limit the range of scenarios—some quite different from a windstorm—that could give rise to coverage under the commercial property insurance portion of the Policy.

6

quality; or [¶] (2) The date when business is resumed at a new permanent location."[5]

The Extra Expense coverage provides for coverage of additional expenses during the restoration period:

> "b.    Extra Expense means necessary expenses you incur during the 'period of restoration' that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.

> "We will pay Extra Expense (other than the expense to repair or replace property) to:

> "(1)   Avoid or minimize the 'suspension' of business and to continue operations at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location.

> "(2)   Minimize the 'suspension' of business if you cannot continue 'operations'.

> "We will also pay Extra Expense to repair or replace property, but only to the extent it reduces the amount of loss that otherwise would have been payable under this Coverage Form."[6]

The Civil Authority coverage applies when Inns' property does not *itself* sustain damage or loss, but damage or loss *somewhere else* gives rise to an order by a civil authority that prohibits access to Inns' premises.  The Policy

---

[5]    Continuing with the storm scenario, if the damage to the roof required Inns to shut down one of its lodging facilities while repairs were made, California Mutual would pay for Inns' resulting loss of business income during the restoration period.

[6]    Thus, for example, if Inns decided after the hypothetical storm to erect tents to house guests while the roof was being repaired, that expense would arguably be covered by the "Extra Expense" coverage.

states, "We will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, *other than at the described premises*, caused by or resulting from any Covered Cause of Loss." (Italics added.)[7]

The complaint alleged that Inns was entitled to recover from California Mutual under either the Business Income coverage or the Civil Authority coverage.

California Mutual filed a demurrer. Specifically, California Mutual argued that the Policy did not provide coverage for Inns' lost business income resulting from the pandemic, under either the Business Income or Civil Authority coverages, because the pandemic did not give rise to direct physical loss of or damage to property. In addition, California Mutual argued that even if the pandemic gave rise to direct physical loss of or damage to property, three exclusions in the Policy operated to exclude coverage.[8]

_____

[7] For example, in the windstorm scenario, if the storm downed powerlines and trees, making it unsafe to enter the neighborhood where one of Inns' lodging facilities was located, but Inns' property was not harmed by the storm, Inns would arguably have coverage for loss of business income while a civil authority prohibited access to Inns' premises.

[8] The first exclusion, which California Mutual refers to as the "Ordinance or Law" exclusion, provides in relevant part: "1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. [¶] a. Ordinance Or Law [¶] The enforcement of any ordinance or law: [¶] (1) Regulating the construction, use or repair of any property; . . ."

The second exclusion, which California Mutual refers to as "the [L]oss of [U]se" exclusion, states, "We will not pay for loss or damage caused by or

8

After holding a hearing, the trial court issued an order on August 6, 2020, sustaining the demurrer without leave to amend. Inns appeals from the judgment.[9]

## II.

## DISCUSSION

A. *Applicable Legal Standards*

We begin with the legal standards governing an appeal from an order sustaining a demurrer. " 'On appeal from an order of dismissal after an order sustaining a demurrer, the standard of review is de novo: we exercise our independent judgment about whether the complaint states a cause of action as a matter of law.' " (*Villafana v. County of San Diego* (2020) 57 Cal.App.5th 1012, 1016.) In reviewing the complaint, "we must assume the truth of all facts properly pleaded by the plaintiffs, as well as those that are judicially noticeable." (*Howard Jarvis Taxpayers Assn. v. City of La Habra* (2001) 25 Cal.4th 809, 814.)[10] We may affirm on any basis stated in

resulting from any of the following: . . . [¶] b. Delay, loss of use or loss of market."

The third exclusion, which California Mutual refers to as the "Acts or Decisions" exclusion, states that California Mutual will not pay for loss or damage caused by or resulting from "b. Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body" unless it results in loss or damage caused by a Covered Cause of Loss.

9    In addition to the parties' appellate briefing, we have considered briefing by amici curiae, both in support of and in opposition to Inns' appeal. This appeal was transferred to us from the Sixth District on June 2, 2021, pursuant to an order of the Chief Justice.

10    As we have taken judicial notice of the Orders, we rely on the Orders themselves for our understanding of their scope and purpose, rather than the vague conclusory allegations of the complaint, such as that the Orders "were

the demurrer, regardless of the ground on which the trial court based its ruling. (*Carman v. Alvord* (1982) 31 Cal.3d 318, 324.)

This appeal requires us to interpret an insurance policy. "While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264 (*Bank of the West*).) "The principles governing the interpretation of insurance policies in California are well settled. 'Our goal in construing insurance contracts, as with contracts generally, is to give effect to the parties' mutual intentions.' " (*Minkler v. Safeco Ins. Co. of America* (2010) 49 Cal.4th 315, 321 (*Minkler*).) " 'Such intent is to be inferred, if possible, solely from the written provisions of the contract. ([Civ. Code], § 1639.) The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" (*id.*, § 1644), controls judicial interpretation. (*Id.*, § 1638.)' " (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 (*Waller*).) " ' "If contractual language is clear and explicit, it governs." ' " (*Minkler*, at p. 321.)

" 'If the terms are ambiguous [i.e., susceptible of more than one reasonable interpretation], we interpret them to protect " 'the objectively reasonable expectations of the insured.' " ' " (*Minkler*, *supra*, 49 Cal.4th at p. 321.) This rule stems from the principle that " '[i]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the

---

made in direct response to the continued and increasing presence of the coronavirus on [Inns'] property and/or around its premises." (Cf. *Ricard v. Grobstein, Goldman, Stevenson, Siegel, LeVine & Mangel* (1992) 6 Cal.App.4th 157, 160 ["a demurrer reaches not only the contents of the complaint, but also such matters as may be properly considered under the doctrine of judicial notice" and " '[t]he pleading must be read as if it contained all matters of which the court could properly take judicial notice' "].)

10

sense in which the promisor believed, at the time of making it, that the promisee understood it.' " (*Bank of the West*, at pp. 1264-1265, quoting Civ. Code, § 1649.)  " 'Only if these rules do not resolve a claimed ambiguity do we resort to the rule that ambiguities are to be resolved *against* the insurer. . . .' The 'tie-breaker' rule of construction against the insurer stems from the recognition that the insurer generally drafted the policy and received premiums to provide the agreed protection." (*Minkler*, at p. 321, italics added.)  "[L]anguage in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract. . . .  Courts will not strain to create an ambiguity where none exists." (*Waller*, *supra*, 11 Cal.4th at pp. 18-19.)

"The insured has the burden of establishing that a claim, unless specifically excluded, is within basic coverage, while the insurer has the burden of establishing that a specific exclusion applies." (*Minkler*, *supra*, 49 Cal.4th at p. 322.)  The principles of contractual interpretation, as applied to insurance policies "do *not* include using public policy to redefine the scope of coverage." (*Ward General Ins. Services, Inc. v. Employers Fire Ins. Co.* (2003) 114 Cal.App.4th 548, 553 (*Ward*).)

B.  *The Scenario Alleged in the Complaint Does Not Trigger the Policy's Business Income Coverage*

The first issue we must consider is whether the scenario pled in the complaint falls within the Policy's Business Income coverage.  The Policy provides: "We will pay for the actual loss of Business Income you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration'.  The 'suspension' must be caused by direct physical loss of or damage to property at [Inns'] premises . . . .  The loss or damage must be caused by or result from a Covered Cause of Loss."  (Italics added.)

11

Here, there is no dispute that certain requirements of the Business Income coverage are satisfied. Specifically, Inns suspended its operations, which led to a loss of business income. However, the issue we must resolve is *whether the suspension of operations was "caused by direct physical loss of or damage to property at [Inns'] premises."* (Italics added.)

In the context of a demurrer, we focus on the facts pled in the complaint. Inns emphasizes that the complaint generally refers to *both* the Orders *and* the presence of the COVID-19 virus when explaining the reason for Inns' suspension of operations. More specifically, however, the complaint describes a three-step chain of causation, beginning with the COVID-19 virus, in which "the continued and increasing presence of the coronavirus on [Inns'] property and/or around its premises" led to the Orders, which in turn led to Inns' suspension of operations.[11] Although the complaint is vague as to the "presence of the coronavirus on [Inns'] property," we will assume for the purpose of our analysis that the complaint describes (or could be amended to describe) a scenario in which, at some point, a person infected with COVID-19 was known to have been present at one or more of Inns' lodging facilities. Importantly, however, we approach our analysis mindful that, as the Orders establish, it was the presence of the virus *throughout* San Mateo and Monterey Counties—not the presence of the virus *specifically* on Inns'

---

[11] We note that the preliminary introductory allegations in the complaint do not specify the factual chain of causation, stating generally that "the Inns were forced to cease operations based on the COVID-19 coronavirus *and* [the Orders]. These orders *and/or* the virus itself . . . prohibited [Inns] from selling any rooms to the public." (Italics added.) We base our analysis on the complaint's more specific causation allegations, as specific allegations in a complaint control over any potentially inconsistent general allegations. (*Perez v. Golden Empire Transit Dist.* (2012) 209 Cal.App.4th 1228, 1235-1236.)

premises—that gave rise to the Orders, leading to Inns' suspension of operations.[12]

Case law establishes that when an insurance policy uses the phrase "direct physical loss of or damage to . . . [p]roperty," "the words 'direct physical' . . . modify both 'loss of' and 'damage to.' " (*Ward*, *supra*, 114 Cal.App.4th at pp. 553-554.) Accordingly, Inns must establish that *either* "direct physical . . . damage to" property at the premises, *or* "direct physical loss of" property at the premises caused its suspension of operations. Inns sets forth arguments under both theories. We consider each in turn.[13]

1.   *In the Scenario Pled in the Complaint, Inns' Operations Were Not Suspended Due to Direct Physical Damage to Inns' Property*

We turn first to the question of whether the suspension of Inns' operations was caused by "direct physical . . . *damage to*" Inns' property. (Italics added.) Inns argues that "the presence of COVID-19 clearly

---

[12]   This litigation does not involve a scenario in which a business has alleged it was the target of an order requiring its *particular* premises to close for a period of time due to the demonstrated presence of a person infected with the COVID-19 virus. For example, such an order hypothetically might be issued to allow a particular business to undertake disinfection procedures or to allow time for the virus to dissipate. Inns has not suggested that it could amend its complaint to add any such allegations. We do not decide whether commercial property insurance coverage might be triggered in such a circumstance.

[13]   The Policy does not define the terms "direct" "physical," "loss" or "damage." Thus, they are to be understood in their " ' "ordinary and popular sense," ' " unless it is shown that they are " ' "used by the parties in a technical sense or a special meaning is given to them by usage" ' " (*Waller*, *supra*, 11 Cal.4th at p. 18.) Other than citing case law interpreting those terms, the parties have not indicated that any of the terms have a technical sense or special meaning.

constitutes the requisite 'damage,' as that undefined term is reasonably understood, because its physical presence transforms property, specifically indoor air and surfaces, from a safe condition to a dangerous and potentially deadly condition unsafe and unfit for its intended purpose."

The words in the phrase "direct physical damage" all have commonly understood meanings. "Physical" is defined as "having material existence : perceptible especially through the senses and subject to the laws of nature." (Merriam-Webster's Online Dictionary (2021) <https://merriam-webster.com /dictionary/physical> [as of Nov. 15, 2021], archived at <https://perma.cc/ Q78D-MKDT>.) "Direct" is defined as "proceeding from one point to another in time or space without deviation or interruption," "stemming immediately from a source," and "characterized by close logical, causal, or consequential relationship." (*Id.*, <https://merriam-webster.com/dictionary/direct> [as of Nov. 15, 2021], archived at <https://perma.cc/MP6D-D9D3>.) "Damage" is defined as "loss or harm resulting from injury to . . . property . . . ." (*Id.*, <https://merriam-webster.com/dictionary/damage> [as of Nov. 15, 2021], archived at <https://perma.cc/FHG4-DDPG>.)

In many circumstances it is relatively simple to determine whether an item of personal property or a business's premises has incurred direct physical damage, leading to a suspension of operations. One can usually focus on whether there is some sort of physical *alteration* to an object or to a building. (See 10A Couch on Insurance (3d ed. 2016) § 148:46, p. 148-95 (Couch) ["There is little question that this threshold" of establishing "physical loss or damage" "has been met when an item of tangible property has been

14

physically altered by perils like fire or water"].)[14]  However, as case law demonstrates, the inquiry is not as simple when, as here, the question is whether the *real property* comprising a policyholder's entire premises has been damaged due to an intervening physical force that does not physically alter any building or item of personal property but makes the real property uninhabitable.  (10A Couch, *supra*, § 148:46, p. 148-95 ["When the structure of the property itself is unchanged to the naked eye, however, and the insured alleges that its usefulness for its normal purposes has been destroyed or reduced, there are serious questions whether the alleged loss satisfies the policy trigger."].)[15]

The Couch treatise gives an example of how such a scenario is treated under a property insurance policy.  Specifically, in *Western Fire Ins. Co. v.*

---

[14]    Inns contends that the phrase "direct physical loss of or damage to" is ambiguous, and we must therefore apply the rules of construction applicable to ambiguous language in an insurance policy.  In support of this argument, Inns relies in large part on the lack of unanimity reflected in the numerous judicial decisions applying the same policy language in the wake of the pandemic.  We reject Inns' argument.  A review of those decisions show that the range in outcomes in courts throughout the country results primarily from the difficulty and complexity of applying policy language in the unprecedented situation created by the pandemic, rather than from any ambiguity in the phrase "direct physical loss of or damage to" property.

[15]    As we have noted, Inns' argument separates the issue of whether direct physical *damage* is present from the issue of whether direct physical *loss* is present.  It is worth noting, however, that some of the case law we rely upon in analyzing Inns' argument regarding "direct physical . . . damage" does not strictly separate the concept of *damage* from the concept of *loss*.  We nevertheless consider the case law to be directly on point as it addresses the issue before us, namely, whether a first party property insurance policy provides coverage when real property has been negatively impacted, in a non-structural manner, by physical forces that make it uninhabitable or unsuitable for its intended use.

*First Presbyterian Church* (Colo. 1968) 437 P.2d 52, 55, real property was determined to suffer "physical damage despite the lack of physical alteration of the property, on the theory that the uninhabitability of the property was due to the fact that gasoline vapors from adjacent property had infiltrated and saturated the insured building." (10A Couch, *supra*, § 148:46, p. 148-99.) Inns and amici cite numerous other cases that fall into the same category, all of which identify the existence of property damage within the meaning of a property insurance policy despite the absence of physical alteration of a structure or object. Based on those authorities, Inns and amici contend that even though the COVID-19 virus does not physically alter the structure of property, it does give rise to "physical . . . damage to property" within the meaning of the Policy because it renders real property uninhabitable and unavailable for its intended use.

The central relevant California opinion is *Hughes v. Potomac Ins. Co. of District of Columbia* (1962) 199 Cal.App.2d 239. In that case, a landslide left a house standing on the edge of, and partially overhanging, a newly-formed 30-foot cliff, depriving it of "subjacent and lateral support essential to [its] stability." (*Id.* at p. 243.) The plaintiff's insurance policy covered physical loss of and damage to the " 'dwelling building.' " (*Id.* at pp. 245-246.) *Hughes* concluded that coverage was triggered under the policy because the dwelling building "suffered real and severe damage when the soil beneath it slid away" even though the structure of the house was undamaged. (*Id.* at p. 249.)

The other cases cited by Inns and amici deal with the presence of noxious substances and odors that rendered real property uninhabitable or unable to be used as intended. The authorities are numerous, although none

16

of them were issued by California courts.[16]  We highlight the central cases here.  First, Inns relies upon *Gregory Packaging, Inc. v. Travelers Property Casualty Co. of America* (D.N.J., Nov. 25, 2014, No. 2:12-cv-04418) 2014 WL 6675934, in which a food packaging business was determined to incur " 'physical loss of or damage to' " its facility under either New Jersey or Georgia law when ammonia was accidentally released, burning an employee and requiring remediation for approximately five days to make the building safe for occupancy.  Inns also highlights *Oregon Shakespeare Festival Assn. v. Great American Ins. Co.* (D.Or., June 7, 2016, No. 1:15-cv-01932-CL) 2016 WL 3267247, vacated by agreement (D.Or., Mar. 6, 2017, No. 1:15-cv-01932-CL) 2017 WL 1034203.  In that case, a theater was forced to close for several days when smoke from nearby wildfires caused health concerns about poor air quality inside the theater.  (*Id.* at p. *2.)  The court determined that the harmful air quality inside the theater constituted physical damage giving rise to coverage because the theater was unusable and uninhabitable, even though the property did not incur any permanent or structural damage.  (*Id.* at p. *9.)  Finally, in *Port Authority of New York and New Jersey v. Affiliated FM Ins. Co.* (3d Cir. 2002) 311 F.3d 226, 236, the court held that "[w]hen the

---

16    Inns cites *Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co.* (1996) 45 Cal.App.4th 1, which considered the issue of asbestos contamination in a building.  However, *Armstrong* is not a persuasive precedent (and we therefore do not discuss it), as it dealt with insurance coverage under a third party commercial general liability (CGL) policy with different policy language and posing distinct coverage issues.  (Cf. *Garvey v. State Farm Fire & Casualty Co.* (1989) 48 Cal.3d 395, 399 [discussing "the important distinction between property loss coverage under a first party property policy and tort liability coverage under a third party liability insurance policy"].)  For the same reason, although Inns' briefing relies to some extent on the language of the CGL section of the Policy to support its interpretation of the commercial property insurance portion, we do not find the provisions in the CGL portion of the Policy to be relevant to our analysis.

presence of large quantities of asbestos in the air of a building is such as to make the structure uninhabitable and unusable, then there has been a distinct loss to its owner" within the meaning of a first party property insurance policy.

Other cases find coverage under property insurance policies in similar situations. (See, e.g., *Matzner v. Seaco Ins. Co.* (Mass.Super.Ct., Aug. 12, 1998, No. CIV. A. 96-0498-B) 1998 WL 566658 [unsafe carbon monoxide levels in an apartment building caused by the chimney's condition was a "direct physical loss of or damage to" the property]; *Farmers Ins. Co. of Oregon v. Trutanich* (Or.Ct.App. 1993) 858 P.2d 1332, 1335 [the persistent odor from a past methamphetamine operation in a house constituted a "physical loss"]; *Mellin v. Northern Security Ins. Co., Inc.* (N.H. 2015) 115 A.3d 799, 805 [remanding for determination of whether persistent cat urine odor in a condominium unit emanating from downstairs was a covered physical loss under the principle that "physical loss may include not only tangible changes to the insured property, but also changes that are perceived by the sense of smell and that exist in the absence of structural damage"]; *Widder v. Louisiana Citizens Property Ins. Corp.* (La.Ct.App. 2011) 82 So.3d 294, 296 [a house made uninhabitable due to contamination with inorganic lead suffered "direct physical loss"]; *TRAVCO Ins. Co. v. Ward* (E.D.Va. 2010) 715 F.Supp.2d 699, 707-708 [a house made uninhabitable by sulfuric gas released from sheets of drywall suffered a direct physical loss].) "The majority of cases appear to support [the] position that physical damage to the property is not necessary, at least where the building in question has been rendered unusable *by physical forces*." (*TRAVCO Ins. Co*, at p. 708, italics added.) As one federal court observed after surveying this case law, "[c]ontamination of a structure that seriously impairs or destroys its function

18

may qualify as direct physical loss." (*Kim-Chee LLC v. Philadelphia Indemnity Ins. Co.* (W.D.N.Y., Apr. 22, 2021, No. 1:20-cv-1136) ___ F.Supp.3d ___, ___ [2021 WL 1600831, at p. *5] (*Kim-Chee*).)[17]

Relying on the case law we have described above, Inns and amici contend that the scenario pled in the complaint is analogous to the cases in which property insurance coverage was triggered because a physical force rendered real property uninhabitable or unsuitable for its intended use, without any structural alteration. As we will explain, we do not find the case law to be applicable here.

---

[17] The same court also observed, "[o]ther cases have concluded that contamination which is short-lived or does not prevent the use of the structure does not qualify as direct physical loss." (*Kim-Chee*, *supra*, ___ F.Supp.3d at p. ___ [2021 WL 1600831, at p. *5].) For example, in *Mama Jo's Inc. v. Sparta Ins. Co.* (11th Cir. 2020) 823 Fed.Appx. 868, a restaurant sought coverage for loss of business income when dust and debris from nearby road construction over the course of many months made it necessary for the restaurant to perform cleaning and also resulted in reduced income during the period of construction. The court held that the dust and debris did not qualify as a "direct physical loss of or damage to" the restaurant property because "an item or structure that merely needs to be cleaned has not suffered a 'loss' which is both 'direct' and 'physical.' " (*Id.* at p. 879.) Similarly, courts have held that real property does not suffer direct physical loss of or damage to property when cleaning is required to remove mold or bacteria, but the building is not rendered uninhabitable. (*Universal Image Productions, Inc. v. Federal Ins. Co.* (6th Cir. 2012) 475 Fed.Appx. 569, 573-574 [the building did not experience physical loss or damage when the ventilation system was shut down to perform an extensive cleaning to remove mold and bacteria, as those agents did not render the building uninhabitable]; *Mastellone v. Lightning Rod Mutual Ins. Co.* (Ohio Ct.App. 2008) 884 N.E.2d 1130, 1145 [presence of mold on the siding of a house did not constitute " 'physical damage' " because it "did not alter or otherwise affect the structural integrity of the siding" and could be treated with bleach].)

Certainly, there are some comparable elements between the scenario pled in the complaint and the case law relied upon by Inns and amici: (1) the COVID-19 virus—like smoke, ammonia, odor, or asbestos—is a physical force; (2) Inns alleges that a physical force (i.e., the COVID-19 virus) was present on its premises; and (3) Inns suspended its operations during the pandemic, presumably concluding that its premises were uninhabitable or unsuitable for their intended use. However, the similarities end there because Inns cannot reasonably allege that the presence of the COVID-19 virus on its premises is what *caused* the premises to be uninhabitable or unsuitable for their intended purpose. As we have discussed, although Inns loosely states that the Orders were issued "in direct response to the continued and increasing presence of the coronavirus on [Inns'] property and/or around its premises," a review of the actual text of the Orders reveal that they were issued because the COVID-19 virus was present *throughout* San Mateo and Monterey Counties, not because of any particular presence of the virus on Inns' premises. Moreover, Inns alleges that it ceased operations "as a direct and proximate result of the Closure Orders." It does not make the proximate cause allegation based on the particular presence of the virus on its premises.

As one court has summarized the contrast between the case law relied upon by Inns and the situation created by pandemic-related government orders, "the presence of COVID-19 on Plaintiff's property did not cause damage to the property necessitating rehabilitation or restoration efforts similar to those required to abate asbestos or remove poisonous fumes which permeate property. Instead, all that is required for Plaintiff to return to full working order is for the [government orders and restrictions to be lifted]." (*First & Stewart Hotel Owner, LLC v. Fireman's Fund Ins. Co.* (W.D.Wash., July 22, 2021, No. 2:21-cv-00344-BJR) 2021 WL 3109724, at p. *4.) "This

20

case . . . concerns an invisible virus that is present throughout the world. . . . It is that general presence, and not a specific physical harm to covered properties, that has caused governments at all levels to consider restrictions. The question, therefore, is one of 'widespread economic loss due to restrictions on human activities, not the consequence of a direct physical loss or damage to the insured premises.' " (*Associates in Periodontics, PLC v. Cincinnati Ins. Co.* (D.Vt., May 18, 2021, No. 2:20-cv-171) ___ F.Supp.3d ___, ___ [2021 WL 1976404, at p. *6].)

Indeed, the lack of causal connection between the alleged physical presence of the virus on Inns' premises and the suspension of Inns' operations can be best understood by considering what would have taken place if Inns had thoroughly sterilized its premises to remove any trace of the virus after the Orders were issued. In that case, Inns would *still* have continued to incur a suspension of operations because the Orders would *still* have been in effect and the normal functioning of society *still* would have been curtailed. As explained in the context of a lawsuit brought by a restaurant to recover for business losses during the pandemic: "[T]he property did not change. The world around it did. And for the property to be useable again, no repair or change can be made to the property—the world must change. Even if a cleaning crew Lysol-ed every inch of the restaurant, it could still not host indoor dining at full capacity. Put simply, Plaintiff seeks to recover from economic losses caused by something physical—not physical losses." (*Town Kitchen LLC v. Certain Underwriters at Lloyd's, London* (S.D.Fla. 2021) 522 F.Supp.3d 1216, 1222.)

Based on the case law we have cited above, it could be possible, in a hypothetical scenario, that an invisible airborne agent would cause a policyholder to suspend operations because of direct physical damage to

21

property. However, the complaint here simply does not describe such a circumstance because it bases its allegations on the situation created by the Orders, which were not directed at a particular business establishment due to the presence of COVID-19 on that specific business's premises. As one court explained, "It could be a different story if a business—which could have otherwise been operating—had to shut down because of the presence of the virus within the facility. For example, a restaurant might need to close for a week if someone in its kitchen tested positive for COVID-19, requiring the entire facility to be thoroughly sanitized and remain empty for a period. Perhaps the restaurant could successfully allege that the virus created physical loss or damage in the same way some chemical contaminant might have. But as the complaint and the closure orders demonstrate . . . , [the plaintiff's] facilities would have had remained shut regardless of whether the virus was present in its facilities." (*Another Planet Entertainment, LLC v. Vigilant Ins. Co.* (N.D.Cal., Feb. 25, 2021, No. 20-cv-07476-VC) 2021 WL 774141, at p. *2.)

In sum, we conclude that despite Inns' allegation that the COVID-19 virus was present on its premises, it has not identified any direct physical damage to property that caused it to suspend its operations.

2.      *In the Scenario Pled in the Complaint, Inns' Operations Were Not Suspended Due to Direct Physical Loss of Inns' Property*

We turn next to the question of whether, as Inns alternatively contends, the scenario pled in the complaint describes a suspension of operations caused by a "direct physical *loss of*" property. (Italics added.) According to Inns, regardless of the physical presence of the COVID-19 virus, it has adequately pled direct physical loss by alleging "the loss of use, function, and value of its property." Thus, as Inns argues, even if we conclude that the presence of the COVID-19 virus on the premises did not

22

constitute *physical damage* to property within the meaning of the Policy, "a policyholder can reasonably expect that a claim constitutes *physical loss* where the insured property cannot function as intended." (Italics added.) As we will explain, this argument fails because it collapses coverage for "direct physical loss" into "loss of use" coverage. Case law and the language of the Policy as a whole establish that the inability to use physical property to generate business income, standing on its own, does not amount to a " ' "suspension" ' . . . caused by direct physical loss of" property within the ordinary and popular meaning of that phrase.[18]

The Couch treatise sets forth the generally recognized principle in the context of first party property insurance that mere loss of use of physical property to generate business income, without any other physical impact on the property, does not give rise to coverage for direct physical loss: "The requirement that the loss be 'physical,' given the ordinary definition of that term, is widely held to exclude alleged losses that are intangible or

---

[18] Although Inns does not focus on the dictionary definition of "loss," it is nevertheless useful to review the common meaning of the word. "Loss" is often used to refer to "destruction" and "ruin" (Merriam-Webster's Online Dictionary (2021) <https://merriam-webster.com/dictionary/loss> [as of Nov. 15, 2021], archived at <https://perma.cc/6FAV-9FSG>, capitalization omitted), but its definition also includes "the partial or complete deterioration or absence of a physical capability or function," "an instance of losing someone or something," and "the harm or privation resulting from losing or being separated from someone or something." (*Ibid.*) Inns' argument that "loss," as used in the Policy, encompasses *loss of use* without any *other* physical impact therefore relies on the aspects of "loss" meaning "absence of a physical capability or function," or perhaps "an instance of losing . . . something." As we will explain, although the dictionary definition of "loss" could encompass the mere loss of use of real property, the surrounding context of the word "loss" in the Policy unambiguously indicates that "direct physical loss of" property cannot reasonably be interpreted to have that meaning.

incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers *a detrimental economic impact* unaccompanied by a distinct, demonstrable, physical alteration of the property." (10A Couch, *supra*, § 148:46, pp. 148-96 to 148-98, fns. omitted, italics added.)[19] California case law has repeatedly cited the Couch treatise in adopting this rule. (*Simon Marketing, Inc. v. Gulf Ins. Co.* (2007) 149 Cal.App.4th 616, 622-624 [quoting the Couch treatise in concluding that loss of business due to cancelled contracts after employees perpetrated a fraud did not constitute physical loss of insured property]; *MRI Healthcare Center of Glendale, Inc. v. State Farm General Ins. Co.* (2010) 187 Cal.App.4th 766, 779 [quoting the Couch treatise in concluding that loss of use of imaging equipment due to inability to ramp it up after turning it off did not constitute "direct physical loss"]; *Doyle v. Fireman's Fund Ins. Co.* (2018) 21 Cal.App.5th 33, 38-39 [quoting *Simon Marketing*'s citation to the Couch treatise in concluding that a wine collector did not suffer loss to property when he purchased counterfeit wine].) In simple terms, under this rule, " 'Plaintiff[s'] operations are not what is insured—the building and the personal property in or on the building are.' " (*Nguyen, supra,* ___F.Supp.3d at p. ___ [2021 WL 2184878, at p. *11].)

Turning to the language of the Policy, the Business Income coverage applies when there is a suspension of operations caused by "direct physical loss of" property. As numerous courts have observed, the words "direct" and "physical" preclude the argument that coverage arises in a situation where

---

19 Given our discussion, *supra*, it is possible that in the context of real property, the "distinct, demonstrable, physical alteration" referenced in the Couch treatise (10A Couch, *supra*, § 148:46, p. 148-98) could include damage that is not structural, but instead is caused by a noxious substance or an odor.

the loss incurred by the policyholder stems solely from an inability to use the physical premises to generate income, without any other physical impact to the property. (See, e.g., *Isaac's Deli, Inc. v. State Auto Property and Casualty Ins. Co.* (E.D.Pa., May 14, 2021, No. 5:20-cv-06165-JMG) ___ F.Supp.3d ___, ___ [2021 WL 1945713, at p. *4] [focusing on the fact that the terms " 'direct' and 'physical' " modify the word " 'loss,' " "a natural reading suggests that the Policy contemplates an explicit nexus between the purported loss and the physical conditions of the covered premises"]; *Image Dental, LLC v. Citizens Ins. Co. of America* (N.D.Ill., June 11, 2021, No. 20-cv-02759) ___ F.Supp.3d ___, ___ [2021 WL 2399988, at pp. *4-*5] [in light of the terms "direct" and "physical", "[s]omething *physical* must cause the loss – that is, the reason for the deprivation must be physical in nature. It is not enough if the deprivation involves something physical."].) As the federal Eighth Circuit Court of Appeals persuasively explained, because the policy language requires "direct 'physical loss' " to trigger coverage, "there must be some *physicality* to the loss . . . of property—*e.g.*, a physical alteration, physical contamination, or physical destruction. . . . The policy cannot reasonably be interpreted to cover *mere loss of use* when the insured's property has suffered no physical loss or damage." (*Oral Surgeons, supra,* 2 F.4th at p. 1144, italics added, citations omitted.) "The cases consistently conclude that there needs to be some *physical* tangible injury . . . to support 'loss of property' or a *physical* alteration or active presence of a contaminant to support 'damage to' property." (*Water Sports Kauai, Inc. v. Fireman's Fund Ins. Co.* (N.D.Cal. 2020) 499 F.Supp.3d 670, 677.)

The Policy's reference to the "period of restoration" further supports our conclusion that mere loss of use, without any other physical impact to Inns' property, is not sufficient to trigger the Business Income coverage. The

Policy states, "We will pay for the actual loss of Business Income you sustain due to the necessary 'suspension' of your 'operations' *during the 'period of restoration'.*  The 'suspension' must be caused by direct physical loss of or damage to property at [Inns'] premises . . . ."  (Italics added.)  Significantly, the "period of restoration" is defined as ending on the earlier of "(1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or [¶] (2) The date when business is resumed at a new permanent location."

The Policy's focus on repairing, rebuilding or replacing property (or moving entirely to a new location) is significant because it implies that the "loss" or "damage" that gives rise to Business Income coverage has a *physical* nature that can be *physically* fixed, or if incapable of being *physically* fixed because it is so heavily destroyed, requires a complete move to a new location.  Put simply, "[t]hat the policy provides coverage until property 'should be repaired, rebuilt or replaced' or until business resumes elsewhere assumes physical alteration of the property, *not mere loss of use."*  (*Oral Surgeons, supra*, 2 F.4th at p. 1144, italics added.)

Inns cites a federal district court decision rejecting the significance of identical "period of restoration" language by explaining that "the 'Period of Restoration' describes a *time* period during which loss of business income will be covered, rather than an explicit definition of coverage."  (*Society Ins., supra*, 521 F.Supp.3d at p. 742.)  This observation misses the point.  We do not focus on the "period of restoration" as an explicit definition of the scope of coverage.  Instead, we cite the language because our task is to interpret the Policy using *the whole* of its language.  (Civ. Code, § 1641 ["The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."].)  The

definition of "period of restoration" provides an indication that the phrase "direct physical loss of" property was not intended to include the mere loss of use of physical property to generate income, without any other physical impact to property that could be repaired, rebuilt or replaced. (See *Santo's, supra*, 15 F.4th at p. 403 ["Baked into this [period of restoration] timing provision is the understanding that any covered 'direct physical loss of or damage to' property could be remedied by repairing, rebuilding, or replacing the property or relocating the business."].)

In sum, we conclude that Inns has not alleged "direct physical loss of" property based on the fact that it lost the ability to use its physical premises to generate income.

3. *The Absence of a Virus Exclusion in the Policy Does Not Impact the Meaning of "Direct Physical Loss of or Damage To" Property*

As an additional argument in support of its contention that it incurred a suspension of operations caused by direct physical loss of or damage to property, Inns points out that even though many first party property insurance policies contain an express exclusion for loss or damage resulting "*from any virus*," no such exclusion was included in the Policy. (Italics added.)

Inns specifically refers to the virus exclusion set forth in a form developed by the Insurance Services Office (ISO) in 2006, which states: " 'We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.' " (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2021) ¶ 6:393.2 [quoting ISO Form CP 01 40 07 06, § B—Exclusion Of Loss Due To Virus or Bacteria]; see also Podoshen, ISO Circular, *New Endorsements Filed To Address Exclusion Of Loss Due To Virus Or Bacteria* (July 6, 2006) <https://www.property

27

insurancecoveragelaw.com/files/2020/03/ISO-Circular-LI-CF-2006-175-Virus.pdf> [as of Nov. 15, 2021], archived at <https://perma.cc/L4WE-ZPYS> [describing the endorsement CP 01 40 07 06].)[20]  Inns argues that "California Mutual's failure to use the 2006 [ISO] Virus Exclusion or any similar exclusion is *prima facie* proof that it *actually intended* to provide coverage for virus losses by not taking advantage of more specific wording that was available to it."

This contention is flawed because it improperly attempts to rely on the absence of an exclusion to create an ambiguity in an otherwise unambiguous insuring clause.  Under California law, "[c]overage is defined in the first instance by the insuring clause, and when an occurrence is clearly not included within the coverage afforded by the insuring clause, it need not also be specifically excluded." (*Glavinich v. Commonwealth Land Title Ins. Co.* (1984) 163 Cal.App.3d 263, 270; see also *Haering v. Topa Ins. Co.* (2016) 244 Cal.App.4th 725, 736 ["[t]he absence of an express exclusion in the . . . policy has no significance unless the insuring agreement can be read to include" the coverage at issue, because " '[b]efore even considering exclusions, a court must examine the coverage provisions to determine whether a claim falls within [the policy terms]' "].)  The same approach is followed in numerous other jurisdictions, all of which hold that the absence of an available exclusion does not imply the existence of coverage.  (See, e.g., *Siegle v. Progressive Consumers Ins. Co.* (Fla. 2002) 819 So.2d 732, 740 ["the existence or nonexistence of an exclusionary provision in an insurance contract is not at

---

20     Some courts have determined that the ISO virus exclusion (or an exclusion with similar language) precludes coverage for business losses arising from the pandemic.  (*Border Chicken AZ LLC v. Nationwide Mutual Ins. Co.* (D.Ariz. 2020) 501 F.Supp.3d 699, 704-705 [collecting cases].)  We express no view on that issue.

all relevant until it has been concluded that the policy provides coverage for the insured's claimed loss"]; *American Manufacturers Mutual Ins. Co. v. Schaefer* (Tex. 2003) 124 S.W.3d 154, 160 ["Absence of an exclusion cannot confer coverage"]; *Advance Watch Co., Ltd. v. Kemper Nat. Ins. Co.* (6th Cir. 1996) 99 F.3d 795, 805 ["the absence of an exclusion cannot create coverage"]; *Doe Run Resources Corp. v. Lexington Ins. Co.* (8th Cir. 2013) 719 F.3d 868, 876 [explaining the "common sense principle" that under Missouri law "the absence of an exclusion, standing alone, does not imply coverage"]; *Yale Univ. v. Cigna Ins. Co.* (D.Conn. 2002) 224 F.Supp.2d 402, 410 ["The mere absence of specific exclusions, standing alone, does not create coverage where it otherwise does not exist under the express terms of the policy."].)

Inns relies on case law holding that "an insurance company's failure to use available language to exclude certain types of liability gives rise to the inference that the parties intended not to so limit coverage." (*Fireman's Fund Ins. Companies v. Atlantic Richfield Co.* (2001) 94 Cal.App.4th 842, 852 [holding that the "additional insured" endorsement in a CGL policy covered the additional insured for liability caused by the additional insured's own negligence because the insurer could have used language in the endorsement stating that coverage applied only to the additional insured's vicarious or derivative liability]; see also *Pardee Construction Co. v. Insurance Co. of the West* (2000) 77 Cal.App.4th 1340, 1359-1360 [in an additional insured endorsement, the insurer's failure to use available language expressly excepting completed operations coverage implied a manifested intent not to do so].) However, this case law is inapposite because it does not deal with the absence of an *exclusion* in a policy; instead, the cases discuss the significance of missing language *in the insuring clause itself*.

In addition, according to Inns, the fact that "the [2006 ISO virus] exclusion exists at all reflects the insurance industry's acknowledgement that a virus is capable of causing 'direct physical loss of or damage to property.' " This argument is misplaced because our analysis does not depend on an across-the-board rule that a virus can *never* give rise to a "direct physical loss of or damage to property" within the meaning of the Policy. As we have noted, it may be possible that in certain hypothetical situations a virus could cause a suspension of operations through direct physical loss of or damage to property. As pled, this is simply not such a case.[21]

C.   *The Policy's Civil Authority Coverage Is Not Triggered By the Scenario Pled in the Complaint*

Having determined that the scenario pled in the complaint does not trigger the Policy's Business Income coverage, we next consider whether, as Inns contends, the Policy's Civil Authority coverage is applicable here.

The Civil Authority coverage states: "We will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises,

---

[21]   Inns also contends that we should look to certain of the Policy's exclusions, such as the exclusion that applies to loss or damage caused by the "[p]resence, growth, proliferation, spread or any activity of 'fungus', wet or dry rot or bacteria." Specifically, Inns contends that such exclusions show that a substance "invisible to the naked eye like bacteria or a virus" are capable of causing "direct physical loss of or damage to" property within the meaning of the Policy. Even were we to look to these exclusions when interpreting the scope of the Policy's insuring clause, Inns' argument misses the point. As we have explained, case law supports the view that in certain circumstances an invisible substance or biological agent might give rise to coverage because it causes a policyholder to suspend operations due to direct physical loss of or damage to property. However, the scenario pled in the complaint does not describe such a circumstance.

30

caused by or resulting from any Covered Cause of Loss." Inns argues that the Civil Authority coverage applies because the complaint "alleged that the government orders were made in direct response to the continued and increasing presence of the coronavirus, a dangerous physical condition, on and around its property." Similarly, the complaint pleads, "[T]he Civil Authority coverage applies because the Closure Orders were 'action[s] of civil authorities that prohibits access to [Plaintiff's] premises due to direct physical loss of or damage to [other] property . . . caused by or resulting from' the COVID-19 coronavirus."

Because Inns identifies the Orders as the "action of civil authority" triggering the Policy's Civil Authority coverage, we look to the Orders to evaluate Inns' contention that the coverage applies here. For the purpose of our analysis we need not, and do not, resolve the disputed issue of whether the Orders "prohibit[ ] access to" Inns' premises. Instead, as we will explain, we conclude that the Civil Authority coverage does not apply because the plain language of the Orders shows that they were not based on "direct physical loss of or damage to property" to other premises.

The Orders are very clear about the reason they were issued. In both of the Orders, the first paragraph states, "The intent of this Order is to ensure that the maximum number of people self-isolate in their places of residence to the maximum extent feasible, while enabling essential services to continue, to slow the spread of COVID-19 to the maximum extent possible." Elaborating on this preliminary explanation, the order issued by Monterey County states:

> "This Order is issued based on evidence of the occurrence of COVID-19 within the County and [surrounding areas], scientific evidence and best practices regarding the most effective approaches to slow the transmission of communicable diseases generally and COVID-19 specifically, and evidence that the age,

31

condition, and health of a significant portion of the population of the County places it at risk for serious health complications, including death, from COVID-19. Due to the occurrence of the COVID-19 virus in the County, the potential for it to spread rapidly through the community, and the World Health Organization declaring COVID-19 to be a pandemic world-wide, there is a public health emergency throughout the County. Making the problem worse, some individuals who contract the COVID-19 virus have no symptoms or have mild symptoms, which means they may not be aware they carry the virus. Because even people without symptoms can transmit the disease, and because evidence shows the disease is easily spread, gatherings can result in preventable transmission of the virus. The scientific evidence shows that at this stage of the emergency, it is essential to slow virus transmission as much as possible to protect the most vulnerable and to prevent the health care system from being overwhelmed. One proven way to slow the transmission is to limit interactions among people to the greatest extent practicable. By reducing the spread of the COVID-19 virus, this Order helps preserve critical and limited healthcare capacity in the County."

The order issued by San Mateo County contains almost identical wording.[22]

Through these statements, the Orders make clear that they were issued in an attempt *to prevent the spread* of the COVID-19 virus. The Orders give no indication that they were issued "due to direct physical loss of or damage to" any property. Therefore, the Orders did not give rise to Civil Authority coverage.

Numerous district court opinions have made the same observation in concluding that government stay-at-home and closure orders resulting from the pandemic did not give rise to Civil Authority coverage. (*Mudpie, Inc. v. Travelers Casualty Ins. Co. of America* (N.D.Cal. 2020) 487 F.Supp.3d 834,

_____

22    In another paragraph, both of the Orders similarly state that due to the occurrence of COVID-19 in surrounding areas, "[t]his Order is necessary to slow the rate of spread."

844 [plaintiff was not entitled to Civil Authority coverage because "the government closure orders were intended to prevent the spread of COVID-19" rather than being based on any "prior property damage"]; *Mortar and Pestle Corp. v. Atain Specialty Ins. Co.* (N.D. Cal. 2020) 508 F.Supp.3d 575, 582 ["it is apparent from the plain language of the cited civil authority orders that such directives were issued to stop the spread of COVID-19 and not as a result of any physical loss of or damage to property"]; *Baker v. Oregon Mutual Ins. Co.* (N.D.Cal., Mar. 25, 2021, No. 20-cv-05467-LB) 2021 WL 1145882, at p. *5 ["the shutdown orders were issued to stop the spread of COVID-19 and were not about loss of or damage to property"]; *Muriel's New Orleans, LLC v. State Farm Fire and Casualty Co.* (E.D.La., Apr. 26, 2021, No. 20-2295) ___ F.Supp.3d ___, ___ [2021 WL 1614812, at p.*12] [coverage under the Civil Authority provision was not invoked because "the Closure Orders were intended to prevent the spread of COVID-19" and therefore "were preventative and lack[ed] the requisite nexus with prior property damage"]; *Hair Studio 1208, LLC v. Hartford Underwriters Ins. Co.* (E.D.Pa., May 14, 2021, No. 20-2171) ___ F.Supp.3d ___, ___ [2021 WL 1945712, at p.*10] ["the Closure Orders were issued to *prevent* the spread of the COVID-19 virus to any of these properties. That fact brings this claim outside the coverage of the Civil Authority endorsement."].)

In sum, the Orders were issued to prevent the spread of the pandemic, not because of any direct physical loss of or damage to property. Accordingly, the Orders did not trigger the Policy's Civil Authority coverage.[23]

---

23    Because we conclude that the scenario pled in the complaint does not trigger coverage under the Policy, we need not, and do not, consider whether, as California Mutual contends, any applicable coverage would nevertheless be excluded due to the Ordinance or Law, Loss of Use, and Acts or Decisions exclusions.

D.       *The Trial Court Properly Sustained the Demurrer Without Leave to Amend*

As a final matter, we consider whether, as Inns contend, the trial court erred in sustaining the demurrer without granting leave to amend.

When a trial court sustains a demurrer without leave to amend, "we must decide whether there is a reasonable possibility the plaintiff could cure the defect with an amendment. . . .  If we find that an amendment could cure the defect, we conclude that the trial court abused its discretion and we reverse; if not, no abuse of discretion has occurred. . . .  The plaintiff has the burden of proving that an amendment would cure the defect."  (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081, citations omitted.)

Here, Inns contends that it should be granted leave to amend to include more information about " 'the science behind the C[OVID]-19 pandemic,' " as the complaint was filed "in March 2020 before scientific understanding had developed."  According to Inns, if granted leave to amend it would include allegations such as those that the district court complimented in *Kingray Inc. v. Farmers Group Inc.* (C.D.Cal. 2021) 523 F.Supp.3d 1163, 1168, fn. 3, stating that "Plaintiffs offer an exceptionally thorough account of the science behind the C[OVID]-19 pandemic in the [first amended complaint], including the relevant facts that C[OVID]-19 is a viral disease commonly transmitted via human-to-human contact which may also spread through fomite transmission."

Although Inns does not elaborate on the type of scientific information it would include, other courts have provided examples of such allegations.  One district court, considering several consolidated lawsuits, summarized the science-based allegations in the applicable complaints as follows:  "(1) 'SARS-CoV-2 [i.e., the virus that causes COVID-19] can remain suspended in the air and travel far from the source on air currents due to HVAC systems and

34

natural airflow.' . . . [¶] (2) Transmission also occurs from property to person when virus-containing droplets land on surfaces creating a 'fomite,' and a person comes into contact with the property and then touches their eyes, nose, or mouth . . . ; and [¶] (3) SARS-CoV-2 can survive on surfaces for hours, days, or weeks, depending on the type of surface affected by the virus." (*Vita Coffee LLC v. Fireman's Fund Insurance Company* (W.D.Wash., July 21, 2021, No. 2:20-CV-01079-BJR) 2021 WL 3077922, at pp. *4-*5; see also *Menominee Indian Tribe of Wisconsin v. Lexington Ins. Co.* (N.D.Cal. Aug. 23, 2021) ___ F.Supp.3d ___, ___ [2021 WL 3727070, at p. *10] [the complaint alleged that " '[w]hen the coronavirus and COVID-19 attach to and adhere on surfaces and materials, they become part of those surfaces and materials, converting the surfaces and materials to fomites' and '[t]his represents a physical change in the affected surface or material.' "].)

Even were Inns to amend its complaint to include specific allegations about how the virus is transmitted and how it can persist on surfaces and in the air, the complaint still would not state a claim for relief under either the Business Income or Civil Authority coverage provisions. As we have explained, with respect to the Policy's Business Income coverage, the scenario pled in the complaint does not state a claim because (1) Inns' suspension of operations was caused by the Orders, not by any physical damage to property, and (2) mere loss of use of real property to generate income does not give rise to coverage. Additional allegations about the science behind the pandemic would not change that analysis. With respect to the Civil Authority coverage, specific scientific information would not solve the fundamental problem that the Orders were issued to prevent the spread of the virus rather than due to any "direct physical loss of or damage to property."

35

Therefore, the trial court did not abuse its discretion in sustaining the demurrer without leave to amend.

DISPOSITION

The judgment is affirmed.


IRION, J.

WE CONCUR:


HUFFMAN, Acting P. J.


O'ROURKE, J.